Good afternoon, your honor. May it please the court and counsel, my name is Greg Addington. I'm an assistant U.S. attorney in Reno, Nevada. It is my privilege to represent the United States before the district court in this case and I'm pleased to be here this afternoon. I'm going to plan to reserve about two minutes for rebuttal, but I will be attentive to my time for good purpose. The district court's disposition of this civil forfeiture case was the product of consideration of the district court's substitute ruling on Mr. Gorman's motion to suppress. There was nothing about the first traffic stop by Spring Grove to Nevada Highway Patrol near Wells, Nevada, that prohibited the ordinary records checks from being conducted by an officer. I'm curious to know what is an ordinary records check? Pardon me? What is an ordinary records check? I mean, look to Rodriguez, the Supreme Court's decision in 2015 for what that is, and those are the warrants, outstanding warrants, a valid driver's license, and a current registration or an expired registration for the vehicle. Yeah. And that's what apparently Gorman wrote and likely done. I thought I saw an epic check, whatever that is. I thought he had a criminally used food check also. Yes. And again, that was done. The so-called epic check, the El Paso Information Center, that's where that inquiry is made. There's different verbiage that's used to describe these different records checks. Chipper Monroe and Deputy Fisher both described these so-called triple high records checks, and they both described that as their internal verbiage to describe that ordinary records check. And I understand what's in an ordinary records check. That is, I understand the warrants. I understand the license, registration. Right? That's all. Those were the things that Rodriguez was talking about, and those have something to do with the person being on the road. Right? So, obviously, why are we doing that? Well, that can be done. Other things can be done, as long as it doesn't extend the duration. However, who says why? Who says that why that these other things can be done? While you're holding the person there, I am speculating. Supreme Court Rodriguez said, other things can be done, as long as it does not extend the time of the traffic stop. Triple high is the other instance of a check, but a history check didn't extend the time. That is correct, and that is very clear. It's important. The facts are important, and the sequence of events are important. The epic check in the big inquiry that Deputy Fisher initiated in connection with his traffic stop near Elko was done while the ordinary records check was still in progress. The sequence is very important here. He engages Mr. Dorman at the site of the motorhome to have a brief conversation about the driver's license and registration. And about why he was pulled over in the first place. Namely, the obstructed sight window that was obstructing the vision of the driver. Oh, so you're talking about the second record. The second stop, not the first stop. That's correct. My focus is on the second stop. Oh. I thought you started with the first stop. I'm sorry. Go ahead. I'm focusing on the first stop. Because that wasn't true for the first stop. The first stop, you have to be sure. Definitely extended the time, quite a concern. I would agree, but there was no second stop. You're also agreeing, I gather, that that's not an ordinary thing that is permissible in direct readers. I don't think there's a case that holds that. I think that was the easy check. And is Australia close to that? Yes, it is. And that's why I'm trying to make the distinction between the ordinary records check, the time that it takes to do that ordinary records check,  which is mainly a T&I assessment of the vehicle that ordinarily cannot be done after the records check is finished. That's what Rodriguez holds. But you can do a T&I assessment while that ordinary records check is in progress. It hasn't been completed yet. Similarly, the so-called epic check could be done while that ordinary records check is in progress. So what you're saying is that the first stop would do away with the epic check, or whatever it would be, to extend the time beyond the ordinary time for a good check? The first stop, my concern, is it would appear to me that he did the ordinary records check and that he extended that stop for a brief time for the epic inquiry. I recognize that that likely was impermissible. I acknowledge that. But there was no search of the motorhome in connection with that first check or stop. Mr. Gorman was released after about 20 minutes or so, and then he went on down the road about 50 miles or so, and Deputy Sheriff Fisher then pulled him over for another check. One argument, as I understand it, is that any records check on the second one wasn't necessary because there already was one, and that he had to, he necessarily knew that, or else he wouldn't have been driving down the road again. This assumption that Deputy Fisher knew, actually knew, what records checks in Truman Road conducted is not correct. We assumed that he likely did a records check and it likely came back clear, but the district court was very clear that Truman Road did not tell Deputy Fisher what records checks he conducted. But didn't Fisher say that he, I mean, in his testimony, that somebody thought so? Yes, he assumed that there likely had been, but there was no actual exchange of information about what records checks had been conducted, and Deputy Fisher candidly acknowledged that even if he had known what Truman Road had done with respect to records checks, he, Fisher, would have done his work. I understand. Would that be appropriate? Yes, it would be. Why? Because... Because we consider fools that accept pre-checks and waste time in order to get to these structures. That's really why. Otherwise, why would you want to do it? For the same reasons, the district court said that it's okay, because the traffic officer, or the officer making that stop, needs to have a level of comfort and confidence about who this person is and what this vehicle is. How did he know? He had just been told. Well, he hadn't been told. Truman Road told him that there was a traffic stop. And he told him who the person was, and he told him where he lived and where he was going. But there's no reason to suppose, if you're Deputy Fisher, there's no reason to suppose that the person coming out of the motorhome is the same person that was encountered by Super Monroe. There's no reason to suppose... Super Monroe could pay the information about the motorhome and its license plates, like some Fisher knew it was there. It seems to me that there's some change between the searches, because Monroe was quite insistent that he needed a dog sniff of this vehicle, and he knew he couldn't get one, and he... Did he delegate that, basically, to Fisher? No, I don't think that's the appropriate characterization. So he delegated that to Deputy Fisher. But he wanted Fisher to do it. Yes, no question about that. That would be a good idea. He communicated the idea that that would be a good idea if Fisher had a key available. But then when the traffic stop was made by Deputy Fisher, first it's important to acknowledge that this was a legitimate traffic stop based on an observed traffic violation, that, in fact, Deputy Fisher was attracted to that motorhome because of the side window obstruction. Before he associated that motorhome with what he previously communicated with Super Monroe, he saw the obstructed side window. He decided that he was going to follow it and pull it over. It was only when he approached it and tried to jump to it and saw that the lower lace was blank, that's when he associated that motorhome with the previous communication. He said it was similar to that. He said when it got behind it, it looked at it closely, something like that. Correct. He said otherwise at other points. He said otherwise about the epitome thing at other points, too. Did the district court specifically make findings about when, whether the Fisher stop was before or after the epitome check was completed? I don't remember that. Did the district court specifically make a finding about whether Fisher's getting the warrant application? And some other points as well. I think in his report that it was after the epitome check that he had the dog. At his testimony he said otherwise. What did the district court find about that? The district court had the video in front of the court and watched it, and we all watched it and listened to it. Deputy Fisher also testified about what the video reflected and what the audio reflected. What did the district court find? I don't remember whether it sounded easy or not. What did he find? He found that the records check, the ordinary records check, was the records check that Fisher was prohibited from conducting because it was redundant to the records check. Fisher from Monroe had done it, even though Fisher didn't know what records checks from Monroe had done. He assumed. I acknowledge that Fisher assumed that Monroe had done a records check. That didn't come back clear. But with respect to the epitome inquiry and the dog assessment, it's important to have the sequence correct. All right, so what did the district court find about the epitome check? I still haven't got an answer to that. He didn't find anything is what you're saying? Deputy Fisher. No. What did the district court find about the epitome check? That it had been initiated by Deputy Fisher while the ordinary records check was still in progress. That Deputy Prowl, P-R-A-L-L, had joined the scene about five minutes in. Deputy Fisher was unable to connect with the dispatch. He could hear radio chatter about some kind of emergency that was occupying the time of dispatch. Deputy Fisher then approaches Deputy Prowl, his colleague, and says, He wanted Deputy Prowl to continue the efforts to connect with dispatch to do that ordinary records check. He gets the dog out of the car, Deputy Fisher does, to go into the bushes. The dog is urinating. While that is going on, and while Deputy Prowl is trying to connect with dispatch to do that ordinary records check, that's when Deputy Fisher calls with his cell phone to initiate the epitome inquiry. And that's when he also does the dog assessment around the motorhome. All of those things were going on while the ordinary records check was still in progress. And there was a delay in doing that. I acknowledge that. But the delay was because dispatch couldn't be contacted. Because in dispatch, Elko County Sheriff's Dispatch was engaged in some other emergency that was preventing, first Deputy Fisher, and then later Deputy Prowl, from initiating that records check. And by the time the dog was finished with the assessment, alerted to the motorhome, within a minute or so after that, Deputy Prowl then tells Deputy Fisher, I was able to initiate the records check. It's in progress. And a very short time thereafter, that was done. The records check was completed. But in the meantime, the dog assessment had been done. The dog alert had been accomplished. It had been effected. And the inquiry was in progress. And that extended the traffic stop beyond the permissible time that the Supreme Court has identified as a permissible feature of every legitimate traffic stop. And just to back up a minute, the government's position from the beginning to have this big a detune, that we should not look at detunes, as stops that are connected to each other in any way. And there are several allocations in it. Proceed otherwise. Yes. I acknowledge that there are these cases that talk about gamesmanship of the police officers, Peters and Forestay from the Second Circuit and the Eighth Circuit. And those are cases that talk about the so-called gamesmanship or collusion between the officers, where it really is one extended investigation. But what about the more simple argument that the defendant makes, which is that the sort of collective knowledge doctrine is essentially a joint string? And it's a collective knowledge doctrine. I thought that was an interesting argument. I think that's contrary to what the Supreme Court said in Wren, W-H-R-E-N. And it's contrary to what this Court has said in Peters. I'm sorry, why is that? Because the frame of mind of the officer is not about the frame of mind. It's about what groups of people working together do collectively. I'm looking at a bright-line test that says when you have an objectively reasonable transaction, you don't have the collusion, you don't have the gamesmanship going on, you don't have the objective. Well, you certainly had collusion. I mean, there's no doubt that you had collusion. Whether you call it good collusion or bad collusion, it was collusion. I'm not going to Google the vocabulary. Well, you can call it cooperation, you can call it collusion, but they were working together. There was communication and collaboration going on, I guess. That's commendable, I would hope. But as long as there's not that gamesmanship going on where there's no more information that is being used, where you're not relying on the exact same information from the previous stop to make the second stop, that's not the case here. This was an objectively reasonable traffic stop. And whenever there's an objectively reasonable traffic stop, Rodriguez tells us that that stop can be accompanied by an ordinary records check. And an officer conducting that legitimate traffic stop should not be required to rely on what might have been done or what was done by another officer in a different agency, in a different environment, in different circumstances, sometime earlier or 15 miles away. That is objectively unreasonable. It puts law enforcement officers at an unacceptable risk, and it's not compelled by any coherent Fourth Amendment analysis. All of my time has been consumed. Thank you, Your Honor. Mr. Socrates, I represent Mr. Marvin O'Skennett in this matter. I'd like to argue in two parts. I want you to follow it clearly and tell us why the set didn't stop in itself without regard to the first violation, and why the conclusion was good for a set point in order to arrive at what I'm making. What I'm making, what I'm making is not the conclusion. The first stop that was undertaken, you knew it would be the argument that was not supported by a traffic violation, but it wasn't. Well, it didn't stop. But it didn't stop. The first detention, the first detention, re-detent, detains. Everything falls apart. And I'd ask you to please not separate the two arguments and tell us what, whether you just had the second stop, what the violation would be. That's one argument. And the second argument is why the truth arrived. What was the problem? Okay. I understand your question now. The second stop, Your Honor, was prolonged in violation of property as well beyond a traffic code enforcement detention and would therefore require reasonable suspicion of independent criminal activity to sustain its duration. It did not. The citation factors that the government has argued established theory of reasonable suspicion are trivial in nature and amount no more than a pure hunch. My client was en route to Northern California to purchase marijuana and probably had big money in hand. And I'm going to catch it. Can I ask you a second? Sure. Given Ran and Rodriguez and so on and so on, we need to be thinking. I understand that you're contesting whether there was any reasonable suspicion to begin with. The district judge found otherwise. Right? No reasonable suspicion. No, there was reasonable suspicion. In other words, as to the traffic stop. Well, as to the traffic stop, yes, it did. Okay. So I understand that you argued in your briefs that that was wrong. We are prosecuting that. Right. But for present purposes, let's say you have to prove that he was clearly an error, that's difficult. I get that. Especially as to the second stop. I don't grant you that regard. So let's go forward from there. Okay. Specifically, in what way was this, without regard to whether he had adequate suspicion of something else, we're going to assume that he didn't have adequate suspicion of something else until he got the dog to stop. So between the stop and the dog's alert, why was the time too long? Because the time was, it was not supported by reasonable suspicion of independent criminal activity. The detention was not. And it was not, neither was it, neither was it confined to a traffic enforcement code. Investigation, which is what Rodriguez talks about. When you go beyond the scope of the traffic. I want to know how it went beyond the scope of the traffic investigation during the relevant time period. Okay. The reason I'm asking is because the questioning was all about where are you going, what are you doing. Was the records check still going on legitimately or not? We don't believe so. And the reason for that is because of two reasons. One, there is a, what I would characterize as a reverse collective knowledge document situation going on here. We have, as far as routine records checks are concerned, they were already exhaustively performed by Trooper Monroe. He conveyed to Trooper Fisher, I've done everything I can to hold this hand. I'm out of time. I have to let the guy go. Get out there with your dog and intercept him and find another reason to stop him and run your dog around his car. Now, he, we, detective said to the judge, his finding that Officer Fisher was aware that Monroe, first off, had exhaustive routine records check is a finding that is not clearly erroneous. He was told by Trooper Monroe, I did all I can to hold this fellow and I had to let him go. But we've got to get into this dog. I'm telling you, he's carrying money. And this put into sequence a series of events that were specifically undertaken by Officer Fisher, which constitute, we respect this again, investigative exploitation of that first illegality, of that first exceedingly long 25-minute detention by Trooper Monroe. And that was carried on by Trooper Fisher, who was dispatched on a priority one basis from the headquarters of the Elko County Sheriff's Office. He was not out on patrol at the time. He was in headquarters and was dispatched specifically to go out and find this vehicle. He assumed a position on the roadside facing eastbound, waiting for this uniquely described vehicle to appear, a white, out-of-state motor home with Delaware plates and so forth and so on, which would be anticipated to arrive at a certain time, having been told the mile marker at which Mr. Gorman had originally been released. So we'll be remiss. If there hadn't been the first stop under current law, that would all be okay. The fact that they said, somebody said to Gorman, we have lots of cases like this, right? If you have, if somebody, they know that he's driving around with drugs and they say, find some way to stop this guy. And then you can run and do the requisite and proper checks and meanwhile run the talk. That would be okay. So you're now looking back to the first errors we were asked not to do. And secondly, you still haven't told me why or whether once the first, second stop started was the records check. You have a concession now by the government, which I don't think you've had until now, that the epic check was not part of a routine stop. Right? So when was the epic check? The epic check was conducted during the second stop, just before deploying the dog. And Judge Hicks found that that was done for the specific purpose of buying time. That was seven minutes into the first, second stop before a routine records check was undertaken. One we submit, which was redundant. And it was even later than that, before the second redundant epic check was undertaken. And Judge Hicks has found that that was done deliberately to buy more time to allow for deployment of a drug office. Had nothing to do with traffic enforcement. This was clearly coordinated. It was clearly an exploitation of the original first stop. I know you asked me how to address that. But I do want the court to be mindful that this is an outgrowth of a series of events that are taking place almost seamlessly. And that led Judge Hicks to ultimately come to the conclusion that not only do we have that, but we have what it really amounts to a comprehensive single Fourth Amendment episode in context. There's no getting around the fact that the court will view the videotapes I short and we'll see that at the very last minute with drug in hand, he tells Trooper Paul Brawl, that's Deputy Fisher, tells Trooper Paul, excuse me, Deputy Brawl, start an epic check also. And he gets him going on that, then deploys the dog. Now he can say that he's in progress while he's deploying the dog. He can now say that the checking is in progress, but he waits for a long time before he asks for that to be done, so that he can create a circumstance where he can claim to have checked in progress while doing the dog. And this was artificially procured according to Judge Hicks' findings. Those findings are not clearly erroneous, and they're based on his first-hand observation of not only the testimony of these witnesses, but the videotape itself. All of this is captured fear independently. Now, as to the, so this leads Judge Hicks to the conclusion, and we think quite rightly, that this is a comprehensive Fourth Amendment situation. There is other authority in other jurisdictions holding, and to that effect, those cases are cited in our brief, in the brief of amicus. What has happened here is mismanship. It is catch, release, and recapture. That's the game being played here. This first officer was quite cognizant that he ran out of time to continue to hold this man. And he specifically says, I've got to let him go. So he calls ahead, has another officer from another agency intercept him with a dog, stopped him again, and sort of make an illusory restoration of the liberty in the interim, one which is quite controlled because you have to go through Elko, Nevada, on I-88 or 10 Sacramento from the location of a Jewish first detainee. So we know that this situation is a gamesmanship that the Second Circuit articulated in the Forreston case in which they talk about that, in fact, the case is absolutely prophetic in our case. And they talk about how it turns the Fourth Amendment requirement requiring an expeditious dog sniff on its head by simply, when you run out of time, go ahead and let him go, coordinate another guy to stop him, and start the clock running again. And that's what they did here. They started the clock running again. And they did so on no further information other than that. Sure. Well, the detention lasted some 15 minutes. What we submit to that was a lock. Either. These are the possibilities to the answer to that question. Either the, I gather that you don't disagree that the soccer records check, leaving out Ed Becker, but the warrants and the license and registration weren't finished at the time of the dog episode. Is that right? What we are contending is that those were started late. I understand that. I'm trying to do this sequentially, okay? Yes, ma'am. So you agree that they weren't finished, right? But you, so your contention is that despite this representation about the, that they couldn't get through to the records and so on, that they purposely dragged them out. Did Judge Magle find about that? Yes, he did. What did he say? He purposely dragged it out. At the Texas Home Medicals, it wasn't true? Yes, he didn't know any evidence of this. There was no evidence. And the office official, when he first made contact with my client, they returned to his table, and he began to immediately start filling out a consent to search form. He made no effort to make the records check. And Judge Fiegg specifically found that this later contention that he did was not corroborated. He claims for further chatter. He called over the radio that suggested to him that the dispatchers were busy with other matters. But there's no evidence of this record of any medical emergency whatsoever, or any attempt on his part. And when Prowl comes, he tells him to do the license. The routine records check. And does Fisher do or Prowl calls the epic people? Nobody asked Prowl to call the epic people. That seemed confused also. It is. And then at certain points, Fisher says that he doesn't do the wrong thing until after the epic is checked. And I can't tell what the district judge says about that. What is it? Found that to be a blatant falsehood. Where? In this warrant application. I want to know where the district judge found that to be a blatant falsehood. There's a vignette if I may retrieve that. Okay. If it is Okay. Page 22 of the court's decision. The court discusses misrepresentations and omissions contained in Fisher's warrant application. And represents various basics for having pulled him over, states that he had no income, source of income. I'm not seeing it right now. Your Honor, I'm trying to rush through this. But the argument was that, in point A, that Fisher claimed that the results of the epic check figured in to his deployment of the dog and supported his deployment of the dog. We know that. We know that they also argued that their epic check was in progress while they were doing the types. And both certainly can't be true. To answer your Honor's question, Judge Reiner, with respect to the independent focus only upon the second substantive, the duration of the exceeds a traffic code violation, so you can get out of the car and proceed to write a ticket and investigate the matter of a pertinent violation of the following line of judgment, that was not even addressed at all. Their purpose was to continue and further what they called our joint suspicions of a drug investigation. And so he proceeds to try to obtain a consent form immediately to gain entry into the vehicle. His concern had nothing to do with traffic code enforcement. It, therefore, required an independent reasonable suspicion. It didn't have it. And Judge Hicks has specifically found that he didn't have it. And his client was drawn rather trivial answers to questions to try to glean some theory of reasonable suspicion. It had nothing to do with traffic enforcement to justify the duration. And he didn't have it. So then he implemented the, he questioned, you know, Mr. Gorman, for a lengthy period of time, on extraneous matters having to do with the drug investigation. None of this had to do with the scope and purpose of the traffic code enforcement investigation. And while he's doing it, he then finally, at long last, has to have a brawl in the records search process. And just before deploying the dog, he has to do an epic check as well as an ordinary records check. So he has plenty of time to claim that he's in progress. But none of this was expeditiously implemented. And that's what is required. That it be done within the time that it ought to have been done. I've exceeded my time, Mr. Spodron. Thank you. I'll be very brief with my rebuttal remarks. This case has nothing to do with reasonable suspicion to extend the duration of exacted stop. It doesn't matter how many times Gorman was stopped for other traffic violations prior to ELCO or after ELCO. He can be a very, very bad driver and get stopped over and over again, so long as each stop is objectively reasonable and justified by an observed traffic violation. No, she's basically, your legal position is that if this could have gone on at an ad infinitum, that is, if you think he's gone and alert, you're still suspicious, they could have sent somebody else down the road another 50 miles and stopped him again. I think there would be a point where it becomes not objectively reasonable that you're not relying on the state's... Well, Gorman needs to take his peace and isolation. Yes, but I'm acknowledging that there might come a point where it becomes objectively unreasonable, but that point was not reached here. If the officer had an objectively reasonable basis for making that traffic stop, if he can actually make that traffic stop, he can absolutely conduct what we're calling an ordinary records check, that that is part of every legitimate traffic stop, no matter what happens before or after. And can I just make a finding, one way or another, about whether the second stop was increasingly prolonged, just looking at the second stop independently, i.e., were this... were the records checks... either were the records checks delayed on purpose or unreasonably delayed or did it wait until the end of the effort? Was there any finding about any of this? No, because the court made its finding based on the conclusion that no records check could be conducted, that the records check was redundant, and so there was no records check committed. There was no finding about how long it took to initiate that check or how long it took or what was going on in the meantime. The facts here are very important about the sequence of events. Deputy Fisher immediately started that records check. But for that reason, you also can't rely on the fact that the records check occurred before, after But he hadn't finished it because there... Fisher clearly said otherwise, at least twice. He initiated that epic inquiry... No, but he said in the barred application, and I believe in his report, that he didn't do that until after the records check was completed. And that is not borne out by the audio and video. I acknowledge that there are some inaccuracies in the application. I'm sorry, I have no fantasy. Well, we have the video and the audio. You can look at it, you can see him doing the epic check on his cell phone. You can see him talking to Deputy Prowell, asking Deputy Prowell to continue to try to contact dispatch because of a medical emergency that's occupying their time. There was a concerted effort, first by Fisher, and then by Prowell to get that records check underway. There was no delay at all, other than the delay that was caused by the infrastructure of the Elbow County Sheriff's Office not being able to accommodate multiple requests coming in. That's what's borne out by the audio. But you can't go through the sheriff's officers as separate. Is it that separate? Different officers do it different ways. I don't mean to quibble. I don't know. But you can use your cell phone to call epic directly. That's what Deputy Fisher did. That's what Deputy Fisher did while he was out with the dog in the bushes, while Deputy Prowell was trying to contact dispatch because Deputy Fisher had been unable to do so until that time. Is there any evidence in the record at all that Deputy Fisher was out on the highway doing anything other than looking for this particular motorhome? Wasn't he basically dispatched for this purpose? I acknowledge that was what he was going out there to do, but the idea of finding this particular motorhome, yes, that is true. I don't want to lose sight of the fact of the procedural error that the court also committed in bringing this case to a conclusion based purely on the motion to suppress. The court made a finding that based on the motion to suppress, this case is over instead of allowing the case to proceed on other evidence that the government may have to advance its forfeiture claims. I'm sorry. Did you present any such evidence to him or argue that he shouldn't have done that? Well, there was no opportunity to do that. The train had already left the station with the court's ruling that the motion to suppress was granted. The former minister of the Greenland Party, he's entitled to fees if he's filed a motion, return the money within 30 days. And so that was the end of the case. And there was no opportunity for us to present any other facts that we have to a properly instructed head finder of the history. Thank you for the court's indulgence. Thank you.
judges: Reinhardt, Berzon, Montgomery